IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 3, 2023

**IN RE CARTIER H. ET AL**

**Appeal from the Juvenile Court for Davidson County**
**No. PT267148        Sheila Calloway, Judge**

_____

**No. M2022-01576-COA-R3-PT**

_____

Mother appeals the termination of her parental rights on four grounds. The Tennessee Department of Children's Services does not defend two of the four grounds, so we reverse as to those grounds. We affirm the ground that Mother is unable to parent the children due to her present mental condition. Because the trial court's order does not contain sufficient findings of fact, we vacate the trial court's findings that the mother failed to manifest a willingness and ability to parent and that termination is in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Reversed in Part; Vacated in Part and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JEFFREY USMAN, J., joined.

Nick Perenich, Tennessee, for the appellant, Amanda H.

Jonathan Skrmetti, Attorney General and Reporter; Carrie Perras, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I. PROCEDURAL AND FACTUAL BACKGROUND**

On April 9, 2018, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") received a referral alleging psychological harm of two children, Cartier, born in February 2011, and Cayden, born in December 2014.[1] The referral stated that the children's mother, Respondent/Appellant Amanda H. ("Mother"), was paranoid and had

_____

[1] In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities.

barricaded herself and her children in her home based on her belief that her neighbor had hired a man to break into her home to kill her. The referral further alleged that Mother stated that she planned to buy a gun to protect herself and the children.[2] The children admitted that they had been up all night and that Cartier did not go to school. As a result of this incident, Mother was involuntarily committed to Tennova Healthcare and the children were removed and placed in DCS custody.

DCS then moved to be granted emergency custody of the children and for them to be declared dependent and neglected. On April 11, 2018, the Davidson County Juvenile Court ("the trial court") granted DCS's petition for emergency custody. The children were placed with a foster family, where they remained throughout the custodial episode.

A juvenile court magistrate later issued an order finding the children dependent and neglected on August 1, 2018. Therein, the trial court found that at the time of the removal, Mother was paranoid and delusional, that she had been diagnosed with bipolar disorder, but was not taking her medication, and that Mother has "unaddressed mental health issues resulting in her involuntary commitment[.]" Following rehearing, the juvenile court judge sustained the allegations in the dependency and neglect petition and specifically found that the children were suffering from the unaddressed mental health issues of Mother, that she suffered from a mental health breakdown at the time of the removal of the children, and that Mother was paranoid and delusional.

Eventually, on November 30, 2021, DCS filed a petition to terminate Mother's parental rights on the grounds of (1) abandonment by failure to establish a suitable home; (2) mental condition making her unable to resume care and custody of the children; (3) persistent conditions; and (4) willingness and ability to parent the children.[3] The trial court held a hearing on the petition on August 11 and 15, 2022. Mother, a court appointed special advocate, the foster mother ("Foster Mother"), a DCS family services worker, and a juvenile court officer testified.

Much of the proof at trial focused on Mother's mental health. Various mental health records were admitted into evidence. These records showed that Mother had been hospitalized a number of times in recent years, including at Tennova at the time of removal in April 2018; at Vanderbilt University Medical Center in June 2018; at Parthenon Pavilion in July 2018; at TrustPoint in August 2018; and at Middle Tennessee Mental Health Institute ("MTMHI") in October 2019. Mother also testified at trial that she had been hospitalized approximately one year prior to trial in 2021 due to unspecified criminal

---

[2] According to the later adjudication order, Mother instead armed herself with pots of boiling water, a taser, and a knife. According to a witness at the dependency and neglect hearing, Cayden had access to this knife and threatened to stab himself with it. Mother also placed salt on the floor to keep evil spirits away.

[3] The petition was also filed against the biological fathers of the children. One father surrendered his rights, and the other's rights were terminated. They are not parties to this appeal.

charges.[4] The records indicated, however, that Mother's mental health issues pre-dated the removal of the children, as she had been hospitalized on more than one occasion prior to the removal of the children, including when she was 15 years old. According to the records, Mother had been diagnosed with bipolar I disorder with psychotic features, depression, post-traumatic stress disorder, panic disorder, and attention deficit hyperactivity disorder. Mother denied that she had ever been diagnosed with any conditions other than generalized anxiety disorder.

The record further showed that Mother often suffered from delusions regarding the children, believing them to be in a dumpster behind Walgreens or kidnapped and made to sell drugs; at the time of these delusions, the children were in DCS custody. Mother participated in a parenting assessment in 2019, which recommended that Mother receive further mental health treatment before any unsupervised contact with the children. Following an August 2021 psychological assessment requested by DCS, the examiner found that Mother "struggles with her mental functioning including psychosis" and is "very impulsive and unstable in her behaviors." As a result, the examiner opined that he did "not believe that parenting education or the implementation of a parenting program through in-home services is likely to be effective given her current level of psychiatric functioning." Instead, he recommended increased pharmaceutical intervention, individual psychotherapy, and efforts to address her history of inappropriate behavior and impulse control.

At trial, Mother minimized her mental health issues. Although she did testify that she had been seeking treatment for approximately twenty years with a psychiatrist, Dr. Hamilton Small,[5] Mother described her treatment with Dr. Small as follows:

> A. [W]e just talk about - we mostly have a lot of laughter. It's mostly about a lot of good times, just about where I go, what I do, how much fun I have every day, and places I see and view. You know, that's mostly what we talk about.
> Q. Are there any kind of stresses or mental health things you work on when you're having therapy with him?
> A. No. We just talk about me being silly and having a ball in life is pretty much it.

Mother admitted, however, that she was prescribed Zyprexa, an antipsychotic. *See Cole v. State*, No. M2016-00625-CCA-R3-PC, 2017 WL 809943, at *2 (Tenn. Crim. App. Mar. 1,

---

[4] Mother stated that she was sentenced to time served on these charges.

[5] The record contains a June 3, 2021 letter from Dr. Small, which states that Mother was seen that day "for her routine, schedule [sic] appointment." The letter further states that Mother is compliant with her medications and treatment plan. Dr. Small participated in a phone interview in connection with Mother's January 2019 mental health assessment, in which he also asserted that Mother was compliant. Dr. Small stated that he was not concerned with her current condition or her ability to care for her children.

2017). Mother initially signed releases for DCS to obtain her mental health records early in the case, but after those releases expired, Mother refused to sign any further releases.[6] As such, the evidence did not include any medical records concerning Mother's mental health treatment in the year before trial; a DCS family service worker admitted that DCS did not attempt to subpoena Dr. Small's records when Mother refused to sign necessary releases.

Mother's criminal history was also discussed. In August 2019, Mother was arrested for aggravated assault; the charge was dismissed, however, when Mother was deemed incompetent to stand trial.[7] In May 2020, Mother was arrested for assault with bodily injury; nothing in the record indicates that she was convicted of this crime. In September 2020, Mother was arrested again for assault and resisting arrest. This charge required that Mother participate in mental health court. Although Mother testified that this case was closed without conviction, the testimony showed that Mother failed to appear for mental health court and three failure to appear warrants were pending against her. When asked how she would care for the children if she was jailed on these warrants, Mother vaguely answered that she would ask the children's fathers, who had little to no contact with the children, to care for them, or look for a "private" foster home.

Mother's conduct at both the termination trial and other hearings before the trial court were also discussed. At a hearing in February 2022, Mother had to be removed from the courtroom when she tried to tear down the COVID-19 barriers after being informed that her children would not be returned to her that day. Mother admitted that she was sentenced to ten days in jail for contempt of court as a result of that incident, as she had "screamed and cussed" at the trial judge and threatened a DCS worker. Mother was also prone to outbursts during the termination trial, often interjecting to disagree with the witnesses or asking witnesses questions while the witness was being questioned by an attorney. For example, when the father of one child was asked to express an opinion as to whether staying in the foster home was best for his child, Mother asked the witness "[w]hat the hell did they threaten you with?" Mother was then asked to step outside the courtroom so the father could testify, at which point she stated as follows upon her exit: "I'm coming. And call me back in when he (unintelligible). Call me back in, because I ain't -- your bullshit. I ain't scared of you folks. F**k to their face. He's (unintelligible) what the white motherf****er told you to do. (unintelligible)."

Mother admitted that after the removal of the children, her lease was not renewed and she lived in two separate domestic violence shelters for over a year. However, Mother testified that in 2019 she moved into a three-bedroom apartment, where she pays all of her bills with social security disability. Mother testified that her first DCS caseworker

---

[6] Mother's refusal to sign releases is also documented in some of the medical records that DCS was able to access for purposes of this case.

[7] Mother denied that this was the reason the charge was dropped.

performed a home visit on the home, but the current family service worker testified that she had asked to perform a home visit but was denied entrance. Mother further testified without dispute that she had paid child support of $300.00 per month for the last two years.

Mother's visitation with the children was also at issue. Mother was permitted twice monthly in-person visits with the children, except when she was incarcerated or during the COVID-19 Pandemic. Over the years, however, the testimony indicated that approximately half of the visits were cancelled or cut short when Mother was more than thirty minutes late or acted inappropriately during the visit. One witness testified that Mother's promptness and attendance improved in 2021. For the most part, Mother's inappropriate behavior at visits concerned her efforts to tell the children that they would be coming home with her on a certain date, when no such reunification had been ordered. This caused the children, especially Cartier, to be fearful and upset. Mother responded to Cartier's distress by telling him that she would leave him in foster care and no longer visit. Once, Mother called the police insisting that the children be returned to her custody. In fact, police were required to escort Mother or the children out of visitation on more than one occasion. On another visit in October 2021, Mother stripped the younger child to his underwear to apply lotion, despite his apparent discomfort. When phone visits occurred during the COVID-19 Pandemic, Mother would tell the children they were coming home on a certain date, then scream and curse at the children, and hang up on them on occasion; Foster Mother testified that it happened so frequently that the children would laugh off Mother's behavior. Even when the visits went as scheduled, Mother did not engage with the children for the majority of the visits. Instead, she watched the children play, played on her phone, or occasionally fell asleep. Mother did bring food and/or gifts for the children to all visits.

The children were placed with their current foster family immediately upon removal and remained with that family continuously. The testimony shows that in the care of the foster family, the children have significantly improved in terms of their emotional and educational development. For example, Cartier could not read and did not know his letters or colors at seven years old at the time of the removal. He still struggles with reading, but is good in math. Cayden had issues with speech, for which he was participating in therapy, which he was anticipated to complete shortly after trial.

The testimony of both Foster Mother and the DCS caseworker was that the children do not have a strong bond with Mother. According to Foster Mother, Cayden has asked about Mother twice; Cartier has never asked about Mother. Often, the children were reluctant to attend visitation with Mother and exhibited behavior problems following the visits. This caused Foster Mother to sometimes not tell the children that they were going for a visit until they were on their way. Cartier cried after at least one visit and had to be consoled by Foster Mother at another after Mother stated that the children would be returning to her care. The children refer to Foster Mother as "Mom" or "Mimi" and they fear being separated from their foster family. The foster family wishes to adopt the children if they become available.

The trial court entered its final order terminating Mother's parental rights on October 26, 2022. Therein, the trial court found that DCS had proven the following grounds against Mother: (1) abandonment by failure to establish a suitable home; (2) mental condition making her unable to resume care and custody of the children; (3) persistence of conditions; and (4) willingness and ability to parent the children. The trial further found that termination was in both children's best interests. Mother thereafter appealed to this Court.

## II. ISSUES PRESENTED

In this appeal, Mother asserts that the trial court erred in finding any of the four grounds of termination were proven by clear and convincing evidence and further erred in finding that termination was in the children's best interests.

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W.3d at 523–24. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." ***In re Carrington H.***, 483 S.W.3d at 524 (citation omitted).

## IV. ANALYSIS

### A. Grounds for Termination

In this case, the trial court found that four grounds were proven by clear and convincing evidence: (1) abandonment by failure to establish a suitable home; (2) inability to parent due to her present mental condition; (3) persistent conditions; and (4) willingness and ability to parent the children. DCS does not defend the grounds of abandonment by failure to establish a suitable home or persistent conditions, so we reverse those grounds for termination. *See* ***In re Aniyah W.***, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at *6 (Tenn. Ct. App. Mar. 1, 2023) ("Given DCS's choice not to defend these grounds and for purposes of judicial economy, we reverse the trial court's findings related to all grounds involving abandonment and consider only the three grounds defended by DCS." (citing ***In re Mason C.***, No. E2018-00535-COA-R3-PT, 2018 WL 4771109, at *3 (Tenn. Ct. App. Oct. 2, 2018))). We will consider each of the two remaining grounds in turn.

### 1. Impairment of Mental Condition

DCS argues, and the trial court found, that Mother's parental rights should be terminated on the ground that she is unable to parent due to her present mental condition, pursuant to Tennessee Code Annotated section 36-1-113(g)(8), which states:

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or

resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated;

. . . .

We have previously explained that

[t]he standard for this issue has been described as inquiring as to whether "by clear and convincing evidence that the parent of the child is incompetent to adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that the parent will be able to assume care and responsibility for the child in the future." *State Dept. of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App. May 30, 2002), *no appl. perm. appeal filed.* This Court has affirmed this ground, in one instance, where the parent "functioned in such a low range that no amount of training, education, or counseling 'could bring him up to the level where he could parent these children.'" *State, Dept. of Children's Services v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008).

*In re Lorenda B.*, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at *9 (Tenn. Ct. App. Apr. 19, 2017).

In concluding that clear and convincing evidence supported this ground for termination, the trial court found as follows:

[Mother] is incompetent to provide adequately for the care and supervision of the children because her mental condition is impaired and is so likely to remain impaired to a level that she will probably not be able to resume the care and responsibility for the children in the near future. There is little chance that the condition can be improved to such an extent that the children can be placed safely with Mother in the foreseeable future.

The children were removed from Mother when she was involuntarily committed due to her untreated mental health issues. As a result of the involuntary commitment, Mother was admitted to Tennova Healthcare in Lebanon, Tennessee. She was treated for agitations and psychosis. Tennova diagnosed Mother with Bipolar 1 disorder, anxiety disorder, and possible amphetamine abuse. Her condition at discharge was improved but not

- 8 -

recovered. Mother was prescribed medication, including Invega for psychosis and Depakote for mood, along with other medications.

Records submitted in trial clearly indicate that [Mother] has an extensive history of untreated mental health issues. Records indicate [Mother] receiving psychiatric treatment from as far back as 1999. In the records, there is proof of several hospitalizations for her mental health issues. In the four years since the children's removal, Mother has continued to be unable to manage her mental health, resulting in numerous psychiatric hospitalizations and arrests.

On August 12, 2019, [Mother] was arrested and charged with aggravated assault with a deadly weapon. As a result of this charge, [Mother] was admitted to MTMHI for treatment and evaluation. After evaluation, [Mother] was found to be incompetent to stand trial. MTMHI also gave her a diagnosis of Bipolar l disorder and post-traumatic stress disorder.

In September of 2020, [Mother] was arrested on multiple charges, including robbery, assault of an officer, and resisting arrest. As a result of those charges, she was ordered to participate in Mental Health Court in the General Sessions Court of Davidson County. Documentation was presented indicating that Mother had not attend[ed] court as ordered since March of 2022 and that she was out of compliance. As a result, there was a failure to appear warrant issued for her.[8]

Mother completed a parenting assessment with Dr. Janie Berryman in 2019. Dr. Berryman's report indicated a need for further mental health treatment before the mother should receive any unsupervised contact with the children.

On August 30, 2021, [Mother] participated in a psychological assessment with Allied Health Professionals. The evaluation diagnosed Mother with Bipolar I disorder, current or most recent episode unspecified[,] and prescribed her antipsychotic medication. The evaluator indicated that [Mother] was likely experiencing more significant symptoms than she was willing to admit and that based on her history it was suspected that Mother struggled with her mental functioning including psychosis. The evaluation recommended that her medications likely needed to be adjusted and that she needed additional psychotherapy with the goal of regular engagement with the therapist to ground her in a more consensual view of reality.

Mother remains presently unable to demonstrate any comprehension of her need for mental health treatment. Mother testified that she did not believe she had any mental health diagnosis and that she was completely healthy. When confronted with the information about her hospitalizations for

---

[8] The trial court stated the following in a footnote: "Mother became aware of the outstanding warrant during the course of the trial. This court finds that she left the courthouse during a court recess in order to avoid having the warrant served and returning to jail."

psychiatric treatment, Mother was either unable to remember that she was hospitalized or was unable to acknowledge that she was being treated for mental health issues. Mother remains unable to recognize her delusional beliefs and continues to behave in an erratic and volatile manner. Her records demonstrate that she has been unable to manage her mental health for any significant duration of time. Her inability to acknowledge her diagnosis or make any changes to her treatment make it unlikely that there will be any change in her mental condition in the future. DCS has proven, by clear and convincing evidence, the ground of incompetence pursuant to T.C.A. §36-1-113(g)(8).

On appeal, Mother asserts that the trial court's findings are not supported by clear and convincing evidence, citing the lack of expert proof presented as to this ground, her testimony regarding her consistent mental health treatment, and Mother's admission that she suffers from anxiety. Mother also argues that this case is analogous to *In re PrinceKenyan F.*, No. M2020-01306-COA-R3-PT, 2021 WL 3855713 (Tenn. Ct. App. Aug. 30, 2021). In that case, the trial court relied heavily on medical records from the mother's stay at two mental health facilities and testimony that the mother's refusal to admit that she is mentally ill and needs treatment. *Id.* at *9. On appeal, DCS further cited the mother's long history of involuntary hospitalizations and a letter to the court in which the mother claimed she was being stalked by a clown.

We held, however, that this testimony did not amount to clear and convincing testimony that the mother's present mental condition prevented the mother from parenting her child. In addition to noting the lack of expert testimony, we cited the lack of "clinical evidence" that the mother's mental health issues negatively affected her parenting abilities. *Id.* And there was no expert proof regarding the mother's present mental state at the time of trial. So we held that DCS failed to show that the mother's mental state was "presently so impaired" as to warrant termination of her parental rights under this ground. *Id.*

On appeal, Mother asserts that the testimony and proof presented in this case is essentially the same as in *In re PrinceKenyan*: proof of prior mental health treatment and hospitalizations without expert proof that Mother's condition makes her presently unable to care for her children. DCS disagrees. For one, DCS points out that it is fairly well settled that the mental condition ground for termination does not require expert proof. *See In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at *11 (Tenn. Ct. App. Sept. 3, 2020) ("Mother points us to no authority, nor have we found any, that expressly requires expert proof in order to satisfy this ground."); *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *8 (Tenn. Ct. App. July 21, 2021) ("[T]he law does not require that DCS provide expert proof in all circumstances to support this ground for termination[.]"); *In re Shaneeque M.*, No. E2014-00795-COA-R3-PT, 2014 WL 6499972, at *9 (Tenn. Ct. App. Nov. 20, 2014) ("[E]xpert testimony on the effect of a parent's mental illness on his or her ability to parent a child is not required[.]"), *perm. app. denied* (Tenn.

- 10 -

Feb. 20, 2015); ***In re Alicia K. A.***, No. E2012-02614-COA-R3-PT, 2013 WL 3422973, at *30 (Tenn. Ct. App. July 8, 2013); ***In re B.L.S.C.***, No. M2008-02301-COA-R3-PT, 2009 WL 971286, at *8 (Tenn. Ct. App. April 7, 2009). Moreover, DCS points out that this Court has held that the parent's own erratic behavior at trial can be evidence in support of this ground. *See **Lorenda B.***, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at *10 (Tenn. Ct. App. Apr. 19, 2017) (declining to overturn the trial court's finding on the basis that no expert proof was offered, and noting that the "most glaring evidence" as to the mother's mental competence in that case was her erratic testimony at trial).

We conclude that sufficient evidence was presented to clearly and convincingly establish this ground for termination. The proof in the record clearly shows that Mother has been hospitalized a number of times since the removal of the children, sometimes due to allegations that she committed violent criminal conduct. Although the record does not show that Mother was convicted of these crimes, she admitted that she threatened a witness at a prior juvenile court hearing and that she had spent stints in jail or mental health institutes of up to six months following the removal.

And at the time of the removal, the children were present to witness the effects of Mother's mental health issues and were exposed to weapons as a result of her delusions. Mother admitted prior to the removal that she was sometimes too overwhelmed to care for her children. Concerningly, the mental health records indicated that Mother suffered from delusions about the children, once threatening someone with a knife and claiming that they kidnapped her children to make them sell drugs. Several assessments recommended that Mother needs to seek additional mental health treatment in order to parent her children, with at least one stating that Mother could not make improvement sufficient to make it safe for her to parent her children. Thus, it was clear from the proof that Mother has mental health issues that prevent her from safely parenting her children.

Mother's inability to appreciate her own limitations and the limitations placed on her by the trial court also continued to harm the children. Despite being asked several times not to do so, Mother continually told the children that they would be coming home with her or had been returned to her. These comments distressed Cartier in particular. Mother herself even called the police to a visitation once in a misguided attempt to have the children returned to her.

Mother continued to minimize her mental health needs and treatment at trial, despite displaying at times erratic and unreasonable behavior during the trial. ***Lorenda B.***, 2017 WL 1416858, at *10. Mother denied that she had been diagnosed with bipolar disorder, despite the medical records clearly showing that she had. Moreover, Mother claimed that none of her prior hospitalizations were due to mental health issues, but each were instead for the purpose of having sex with a man.[9] Later when Mother was asked about her stay in

---

[9] Mother specifically testified that she "went to a couple of psychiatric hospitals to have sex with a

- 11 -

a domestic violence shelter by counsel for DCS, Mother answered as follows:

> A. You tell me why I went in there.
> Q. Well, I wouldn't know. I'm asking you.
> A. I mean, I wouldn't know neither. Are you looking for some sex?
> Q. You don't --
> A. Are you looking for some sex?
> Q. You don't remember --
> A. Are you looking for some sex? I'm going to ask straight up now. Don't f**k my life up.

As previously discussed, Mother also often interjected during the testimony of other witnesses.

Furthermore, while Mother insisted that she was seeking treatment, as she had done for years, from a Dr. Small at the time of trial, she refused to sign releases for DCS to obtain mental health records to confirm her claims that she was receiving appropriate treatment.[10] Even crediting Mother's testimony that she has been consistently participating in mental health treatment, when asked about what kind of treatment she undergoes with Dr. Small, Mother testified that they generally just discuss how much fun Mother has. So Mother's treatment apparently does not involve treating her delusions, her anxiety, or her paranoia. Clearly, then, even if Mother is receiving treatment from Dr. Small, it is not of the type that is sufficient to address the significant mental health challenges that negatively affect her ability to parent her children. Without adequate treatment, it appears unlikely that Mother will be able to make sufficient progress to ever safely parent her children. Under these circumstances, we conclude that DCS met its burden to establish that Mother is incompetent to adequately provide for the further care and supervision of her children because Mother's mental condition is presently so impaired and is so likely to remain so that it is unlikely that Mother will be able to resume the care of and responsibility for the children in the near future.

### 2. Willingness and Ability

DCS next contends that Mother failed to manifest a willingness and ability, whether by act or omission, to personally assume legal and physical custody or financial responsibility of the child and that placing the child in her legal and physical custody would create a risk of substantial harm to the child's physical or psychological welfare. *See* Tenn.

---

man" then explained that "I went to have sex with a man, I'm telling you. I went to have sex with a man. Wasn't nothing with me, the same man that would f**k me before we left the house was f***ing me in the hospitals. . . . Everywhere I went, that's what we did."

[10] The letter from Dr. Small cited by Mother was dated over a year prior to the termination trial. However, the testimony indicated that Mother had produced several letters from Dr. Small throughout the case.

Code Ann. § 36-1-113(g)(14). Essentially, the statutory ground has two distinct elements which must be proven by clear and convincing evidence:

> First, DCS must prove that Mother failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." DCS must then prove that placing the children in Mother's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]."

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (alterations in original) (quoting Tenn. Code Ann. § 36-1-113(g)(14)). As for the first element, the petitioner must "prove[] by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> [an] ability or willingness" to parent the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020).

Mother argues on appeal that the trial court's order is deficient in that it did not make sufficient findings as to the first prong of the analysis. We agree that the trial court's order is deficient. In relevant part, the trial court's ruling as to this ground is as follows:

> The children are placed in a pre-adoptive foster home which has been their home since their removal more than four years ago in April of 2018. The children have a strong bond with their foster parents. The foster parents have helped the boys progress with their education and have been engaged in the boys' therapeutic services. Since coming into foster care, the children have changed from being shy and quiet to very outgoing and social. They have developed a sibling relationship with the other children in the foster home. Removing the children from this stable home and depriving them of the relationships they have developed with their foster family would have devasting effects on the children.
>
> The children do not have a bonded relationship with their mother. Since they have been in DCS custody, Mother's visits have been inconsistent. When they have had visits, they have been problematic. Mother has demonstrated a lack of engagement with the children during the visits. Additionally, there were multiple incidents where her behavior during the visits was inappropriate and distressing to the children.
>
> [Omitted discussion of a biological father].
>
> Neither parent at this time has manifested an ability or willingness to assume legal or physical custody or financial responsibility of the children. Furthermore, placing the children in their legal and physical custody would pose a risk of substantial harm to the welfare of the children. DCS has proven, by clear and convincing evidence, the ground for termination contained in T.C.A. § 36-1- 113(g)(14).

As detailed above, the trial court's order contains no findings as to how Mother failed to demonstrate either a willingness or an ability to take physical custody of her children or provide them with financial support.[11] Instead, the trial court's order appears to address only the effect to the children if they were removed from their current foster home, which we infer was intended to address the substantial harm prong of this ground.

The failure to make specific findings in support of each prong of this ground for termination prevents meaningful appellate review:

> With respect to termination cases, the trial court is specifically directed by the statute to "enter an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). Furthermore, neither the trial court nor this Court may proceed to termination absent clear and convincing evidence of each necessary element of a ground for termination. *In re R.L.M.*, No. E2013-02723-COA-R3-PT, 2015 WL 389635, at *4 (Tenn. Ct. App. Jan. 29, 2015). Because the trial court did not make specific findings regarding each of the elements applicable to the failure to manifest ground, we are compelled to vacate the termination order with respect to this ground for termination as to the [parent] and remand for the preparation of appropriate findings of facts and conclusions of law as is required by the statute. *See In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *14 (Tenn. Ct. App. Jan. 25, 2019) (vacating termination order as to the [parent's] rights because of a failure to make proper findings to each element as required under Tennessee Code Annotated section 36-1-113(g)(14)); *In re Brianna B.*, No. M2017-02436-COA-R3-PT, 2018 WL 6719851, at *8 (Tenn. Ct. App. Dec. 19, 2018) (noting that the trial court failed to issue any specific findings of fact concerning the *substantial harm* element of the statute).

*In re Nevaeh B.*, No. E2020-00315-COA-R3-PT, 2020 WL 4920020, at *3 (Tenn. Ct. App. Aug. 20, 2020); *see also In re Autumn D.*, No. E2020-00560-COA-R3-PT, 2020 WL 6306056, at *5 (Tenn. Ct. App. Oct. 28, 2020) (relying on *In re Nevaeh B.* to vacate this ground for termination).

Here, the trial court's order makes no findings that explicitly or implicitly address the first prong of this ground. And to the extent that we read the trial court's order as ruling that the negative effect on the children of being removed from their foster home is sufficient to constitute substantial harm under the second prong of this ground, Mother argues that this focus was error. Indeed, while this Court has held that forcing a child to reunite with a virtual stranger can constitute substantial harm for purposes of this ground, *see In re*

---

[11] The financial support aspect of this ground for termination does not appear to be at issue in this case.

- 14 -

***Brianna B.***, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021), we have also held that "[r]emoval of a child from foster parents that the child has been living with for a long time and may have bonded with does not constitute substantial harm." ***In re Nakayia S.***, No. M2019-00644-COA-R3-PT, 2020 WL 4558376, at *8 n.6 (Tenn. Ct. App. Aug. 7, 2020) (quoting the father's argument) (citing ***In re Alysia S.***, 460 S.W.3d 536, 576–77 (Tenn. Ct. App. 2014)). DCS does not assert that Mother is a stranger to the children, but contends that the negative effect of the removal, coupled with other factors, including Mother's ongoing mental health issues and her repeated incarceration, all amount to a probable risk of substantial harm. But the trial court's order does not discuss any of these additional facts with regard to this ground. So the trial court's ruling that DCS established this ground for termination is vacated, and this cause is remanded for the entry of an order that contains specific findings of fact and conclusions of law with regard to both prongs of this ground for termination.

## B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the children's best interest. Tenn. Code Ann. § 36-1-113(c)(2); ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). In determining the best interest of a child, the court "shall consider all relevant and child-centered factors applicable to a particular case before the court." Tenn. Code Ann. § 36-1-113(i)(1). The factors "may include, but are not limited to":

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
> (H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." Tenn. Code Ann. § 36-1-113(i)(3).

In this case, the trial court ostensibly cited only seven factors in its best interest determination. But arguably, it cited even fewer than seven of the above twenty factors in its order. To be sure, the trial court cites factors (A), (B), (H), and (O) in its order. But factor (B) is cited twice. The trial court then cites two other factors that better resemble the best interest factors prior to the 2021 amendment. Specifically, the trial court cites as a factor in consideration "[w]hether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in the home of the parent or guardian[.]" *See also* Tenn. Code Ann. § 36-1-113(i)(1) (2020) (directing the court to consider "[w]hether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian"). This is similar to factor (J), but not identical. The trial court also considered "[w]hether a meaningful relationship has otherwise been established between the parent or guardian and the children," which most resembles factor (D). *See also* Tenn. Code Ann. § 36-1-113(i)(5) (2020) (directing the court to consider "[w]hether a meaningful relationship has otherwise been established between the parent or guardian and the child"). So then, it appears that the trial court has applied some amalgam of the old best interest factors and the new without considering the entirety of either set.

In some prior cases, we have held that it was not reversible error for the trial court to consider both some of the old and new factors in reaching its ultimate decision as to best interest. *See **In re Mitchell B.***, No. M2022-01285-COA-R3-PT, 2023 WL 3619561, at *6 (Tenn. Ct. App. May 24, 2023); ***In re Da'Moni J.***, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022), *perm. app. denied* (Tenn. Apr. 1, 2022). Rather, we held that if the trial court's ruling provides a detailed summary of the trial court's reasoning such that this Court can make a meaningful review of the trial court's findings, this practice is not error "so long as the factors considered are relevant to the facts presented in th[e] case." ***In re Mitchell B.***, 2023 WL 3619561, at *6. In both cited cases, however, the trial courts entered detailed and thorough orders considering an abundance of best interest factors.

Here, even acceding that the trial court's reference to the old factors is a proper substitute for consideration of similar new factors, the trial court considered no more than six of the twenty factors that are applicable in this case. Although we have held with regard to the pre-amendment statute that "the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child," ***In re M.A.R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005), trial courts are still required to make specific findings as to each factor found to be applicable. Tenn. Code Ann. § 36-1-113(i)(3). Moreover, to the extent that the trial court may have found none of the other factors to be applicable to this case, we simply cannot agree.

To be clear, some factors cited by the trial court involve such similar considerations

as other uncited factors as to not be an issue. For example, factors (A) and (C) focus on the stability and continuity of the children. The trial court also considered Mother's visitation, relevant to factor (E), when it discussed whether a meaningful relationship existed between Mother and the children. Likewise, the trial court briefly discussed the bond that the children have with their foster siblings, a consideration under factor (I), when it discussed the effect of a change in caretakers on the child. Finally, the trial court clearly considered Mother's mental health issues and the risk of psychological harm her behavior poses to the children, while inexplicably failing to cite the factors most focused on those considerations. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N), (T).

The same, however, is not true of many other factors. For example, Factors (K) and (L) concern the efforts DCS has made in the case to assist the parent and whether the parent has taken advantage of those programs. Obviously DCS was a party to this case, and its efforts are relevant to the best interest analysis. *See **In re Kaliyah S.***, 455 S.W.3d 533, 555 (Tenn. 2015) (applying the old factors, which also considered the reasonable efforts by DCS). But the trial court did not consider either of these factors during its best interest analysis.[12] Likewise, the trial court did not consider Mother's sense of urgency in addressing the circumstances that led to the removal of the children, as detailed in factor (M). The trial court also did not discuss Mother's home environment, relevant to factors (Q) and (R), despite considerable testimony on this issue. Similarly, while the trial court noted that the children received counseling as a result of their past trauma, the trial court did not make findings as to whether the children are fearful of living in Mother's home or whether Mother or her home trigger the children's trauma, as relevant to factors (F) and (G), when several witnesses testified as to this issue. Finally, the trial court did not discuss Mother's history of child support payments, as detailed in factor (S), despite her testimony that she consistently paid child support, or the fact that she always provided food, gifts, and clothing at visitations for the children. *See* Tenn. Code Ann. § 36-1-113(i)(1)(P).

While our review of the factors indicates that some of the factors that the trial court chose not to cite would still favor termination, such as Mother's clear mental health issues under factor (T), others are less clear or may even favor Mother, such as Mother's history of child support payments or the stability and environment of Mother's physical home. While we tend to agree that Mother's mental health and her interactions with the children during visitation hold considerable weight in this case, it is somewhat troubling that the trial court essentially chose to ignore all the factors that weighed even slightly in favor of Mother. Still, the Tennessee Supreme Court has held that courts have a duty to "consider all of the statutory factors, as well as any other relevant proof any party offers" even when one factor "dictate[s] the outcome of the analysis." ***In re Gabriella D.***, 531 S.W.3d 662,

---

[12] The trial court did make a finding that DCS made reasonable efforts to assist Mother in establishing a suitable home as it pertained to the grounds for termination. But as previously discussed, DCS does not defend the abandonment by suitable home ground for termination. Moreover, the reasonable efforts considered with regard to that ground is limited to a four-month period following removal. *See* Tenn. Code Ann. § 36-1-102(1)(a)(ii)(c). The best interest factors contain no such limitation.

682 (Tenn. 2017) (noting that the fact that one factor may be outcome determinative "does not mean that a court is relieved of the obligation of considering all the factors and all the proof").

Thus, it is the trial court's duty to consider whether DCS met its burden to produce evidence of each applicable factor and to make specific findings thereon. *See In re Kaliyah S.*, 455 S.W.3d at 555 (noting that "factual findings made in connection with the best-interest analysis . . . must be proven by a preponderance of the evidence, not by clear and convincing evidence"). And this Court has held that DCS's failure to submit sufficient proof as to a factor does not necessarily mean that the factor is inapplicable. For example, where DCS puts on no proof of brutality, abuse, or neglect by the parent or others residing in or frequenting the home, that factor is not inapplicable, but not proven to weigh in favor of termination; so, it weighs against termination. *See In re Erin N.*, No. E2021-00516-COA-R3-PT, 2022 WL 444284, at *27 (Tenn. Ct. App. Feb. 14, 2022) ("Based on the lack of evidence concerning Father's mental or emotional status, we determine that the court erred by weighing the factor neutrally instead of against termination."); *see also In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *20 (Tenn. Ct. App. July 22, 2020) ("In the absence of evidence that tied Father to abuse, an unsafe home, or an unstable mental or emotional state, we must conclude that these factors weigh against termination."); *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020) (concluding that the eighth factor under the pre-amendment statute weighed against termination because no proof related to the father's mental or emotional status was presented). Thus, characterizing a factor as inapplicable should not be used as a means of minimizing the points in a parent's favor.

So then, the trial court here failed to make specific findings as to a number of relevant factors. As this Court has explained, "Tennessee Code Annotated section 36-1-113(k) 'explicitly requires courts terminating parental rights to enter an order which makes specific findings of fact and conclusions of law whether they have been requested to do so or not.'" *In re Maria B.S.*, No. E2011-01784-COA-R3-PT, 2012 WL 1431244, at *2 (Tenn. Ct. App. Apr. 25, 2012) (quoting *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). As we have explained,

> "Meticulous compliance with the mandates of Tenn. Code Ann. § 36-1-113(k) [is] required by appellate courts." *In re MEI,* No. E2004-02096-COA-R3-PT, 2005 WL 2346978, at *3 (Tenn. Ct. App. Sept. 26, 2005). "When a trial court has not complied with Tenn. Code Ann. § 36-1-113(k), we cannot simply review the record de novo and determine for ourselves where the preponderance of the evidence lies as we would in other civil, non-jury cases." *In re K.N.R.*, [No. M2003-1301-COA-R3-PT,] 2003 WL 22999427, at *3 [(Tenn. Ct. App. Dec. 23, 2003)].

A trial court's failure to comply with Tenn. Code Ann. § 36-1-

113(k) affects more than the standard of appellate review. It affects the viability of the appeal. When a trial court fails to enter an order containing adequate findings of fact and conclusions of law with regard to all alleged grounds for termination, the Tennessee Supreme Court has instructed the appellate courts to remand the case to the trial court for the preparation of appropriate written findings of fact and conclusions of law. *In re D.L.B.*, [118 S.W.3d 360, 367 (Tenn. 2003)].

> *In re C.R.B.*, No. M2003-00345-COA-R3-JV, 2003 WL 22680911, at *4 (Tenn. Ct. App. Nov. 13, 2003) (footnote omitted).

*In re Maria B.S.*, 2012 WL 1431244, at *3. This rule has been applied when the trial court fails to make findings of fact in support of either the grounds for termination or the best interest determination. *See, e.g.*, *id.* (involving the ground for termination); *In re Zoey L.*, No. E2019-01702-COA-R3-PT, 2020 WL 2950549, at *3 (Tenn. Ct. App. June 3, 2020) (involving the best interest determination); *In re B.L.R.*, No. W2004-02636-COA-R3-PT, 2005 WL 1842502, at *17 (Tenn. Ct. App. Aug. 4, 2005) (involving the best interest determination).

We recognize that vacating the trial court's ruling will only prolong the proceedings and delay finality for the children at issue in this case. However,

> [a]ll parties affected by these proceedings have a right to a prompt and just adjudication of their rights and interests. . . . [T]he parties also have a reasonable and legally enforceable expectation that . . . the courts will comply with the plain statutory requirements when they undertake to extinguish the relationship between a parent and his or her children.

*In re Maria*, 2012 WL 1431244, at *5 (quoting *In re C.R.B.*, 2003 WL 22680911, at *4). Here, the Tennessee General Assembly has clearly directed courts to consider and make specific findings as to all applicable factors. The trial court did not comply with this mandate. As such, "we are left with no choice but to remand the case with directions to make the required specific written findings of fact and conclusions of law." *Id.*

## V. CONCLUSION

The decision of the Juvenile Court of Davidson County is affirmed in part, reversed in part, and vacated in part, and this cause is remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellee the Tennessee Department of Children's Services, for which execution may issue if necessary.

_s/ J. Steven Stafford_
J. STEVEN STAFFORD, JUDGE